## THE CARONDELET IRON WORKS

*v.*

## GEORGE S. MOORE *et al.*

78 65
208 ⁴228

1. CONTRACT—*time for exercising an option reserved.* Where a contract for the purchase of all the iron manufactured up to a certain date, by a company, provided that the proportion of white and mottled iron should not exceed ten per cent of the quantity of gray mill iron, and in case of such excess, the purchaser should have the option to reject such excess: *Held,* that the purchaser was bound to accept and pay for all the iron manufactured, except as to such excess, and also, that unless the option to reject it was manifested in a reasonable time after the quantities were ascertained, and notice thereof given.

2. WARRANTY—*statement in bill rendered not regarded.* The mere description of iron sold, as mill iron, in a bill rendered to the purchaser, will not amount to a warranty that the same is of the quality or grade described, but will be regarded as a mere statement or expression of opinion as to the quality.

3. SAME—*words used must show an intent to warrant.* While no particular form of words is required to make a warranty, and it is not necessary that the word warrant be used, still it is necessary that such expressions should be used as to show the intention of the party to bind himself to make good the quality of the articles as described or represented, and not a mere statement or expression of opinion as to the quality.

4. FRAUD—*in sale of property, as to quality.* Where the purchaser of personal property sees the property before taking possession, and has every opportunity to inspect the same, and no concealment is used on the part of the seller, or representations made respecting the quality, to induce the purchaser not to examine the same, the purchaser can not recover on the ground of fraud and deceit.

WRIT OF ERROR to the Circuit Court of St. Clair county; the Hon. WILLIAM H. SNYDER, Judge, presiding.

Messrs. HITCHCOCK, LUBKE & PLAYER, and Messrs. G. & G. A. KŒRNER, for the plaintiff in error.

Messrs. NOBLE & ORRICK, and Messrs. UNDERWOOD & NŒTLING, for the defendants in error.

5—78TH ILL.

Mr. JUSTICE CRAIG delivered the opinion of the Court:

This was an action of assumpsit, brought by Geo. S. Moore and Geo. D. Morris, partners, composing the firm of Geo. S. Moore & Co., against the Carondelet Iron Works, in the circuit court of St. Clair county.

The declaration contained two counts. The first, for money had and received; the second set out a written contract entered into between the parties, under which the iron works had sold plaintiffs the entire product of all iron manufactured at its furnace during a specified time, at a certain price, and concludes with an averment that, on, to-wit: February 12th, 1873, the defendant knowingly and falsely pretended and warranted that it had manufactured, for the plaintiff, 610 tons of mill iron, and piled the same in the yard of defendant for the plaintiffs, and the plaintiffs, relying upon the truth of the representations and warranty, paid $45 per ton for the same, being the sum of $27,450; when, in fact, none of said iron was mill iron, as represented and warranted, but all of the same was white-mottled iron, an article of inferior value.

To the declaration, the defendant pleaded the general issue. A trial was had before a jury, which resulted in a verdict in favor of the plaintiffs, for $14,228. The court overruled a motion for a new trial, and rendered judgment upon the verdict, to reverse which the defendant has brought the record here by writ of error.

The contract entered into between the parties in regard to the iron bears date July 27th, 1872, and it provides: "That the Carondelet Iron Works have this day sold to the said George S. Moore & Co. the entire product, more or less, in pig iron, of their furnace, from the 1st day of August, A. D. 1872, to the 31st day of December, A. D. 1872, inclusive, at ($50) fifty dollars No. 1 foundry, ($48) forty-eight dollars No. 2 foundry, ($45) forty-five dollars for mill, and ($43) forty-three dollars for white and mottled iron, the proportion of white and mottled iron not to exceed ten per cent of the

quantity of gray mill iron; and in case of such excess of white and mottled iron, said George S. Moore & Co. have the option to reject such excess over ten per cent; the said iron to be weighed at the furnace, and delivered at the furnace landing, on boats or cars, free of charge; payments to be made on the first days of each month, in cash, for all the iron made during the month last preceding, whether taken away or not."

On the 12th day of February, 1873, the defendant rendered a statement to Moore & Co., as follows:

"ST. LOUIS, *Feb.* 12, 1873.

Messrs. GEORGE S. MOORE & CO.,

Bought of Carondelet Iron Works :

| | |
|---|---|
| 138 tons No. 1 Iron, 50 | $6,900 |
| 400 tons No. 2 Iron, 48 | 19,200 |
| 610 tons *Mill* Iron, 45 | 27,450 |
| | $53,550 |

Certificate sent, and iron piled in our yard.

C. I. W. per McN————."

The controversy in this case grows out of the 610 tons of iron embraced in the statement, for which Moore & Co. paid $27,450, upon the rendition of the account.

It is not claimed that the contract of date July 27th, 1872, was ever in any manner changed or modified by the parties, but it is conceded to be in full force and effect.

To determine, then, the rights and obligations of the parties, resort must be had to the contract under which the iron was manufactured and furnished.

Under the contract, and by its express terms, Moore & Co. purchased the entire product, more or less, in pig iron, of the furnace of the defendant, from the 1st day of August, 1872, to the 31st of December, 1872.

The Carondelet Iron Works did not contract to furnish any definite amount of any particular grade of iron, nor was it concluded by the contract as to the quantity of the entire pro-

duct, or as to the amount of each grade, or as to the quality of the iron to be manufactured.

The iron works was absolutely bound to deliver to the plaintiffs the entire product of its furnace which should be manufactured between the specified dates named in the contract.

On the other hand, Moore & Co. were bound by the contract to accept and pay for the entire product of the furnace, except an option was reserved on their part: in case the white and mottled iron manufactured exceeded ten per cent of the quantity of gray mill iron, then they had the option to reject such excess over ten per cent.

It is clear, by the terms of the contract, the entire product of the furnace was purchased by the plaintiffs, unless they, when the quantity of mill and of white and mottled irons was ascertained, should elect to reject a given quantity of the latter, as provided by the contract, and within a reasonable time exercise that option.

It is not averred in the declaration, nor shown by the proof, the amount of mill or white and mottled irons manufactured at the furnace from the 1st day of August, 1872, to the 31st day of December. Under such circumstances, we are at a loss to conjecture upon what principle or by what authority Moore & Co. would have the right to reject any portion of the white and mottled iron, as the contract only gave them the option to reject the excess of white and mottled iron over ten per cent of gray mill.

It is true, Moore testified that the defendant delivered his firm from 1800 to 2000 tons of iron under their contract, and that this embraced No. 1 and No. 2 foundry, and gray mill iron, as defendant billed it to them, and, upon his re-examination, he says he told Cashmon, in December, 1873, that he refused to take any of the iron except the ten per cent, and it amounted to 2 tons and a fraction on the 21 tons which had been shipped, etc.

But this can not be regarded as sufficient to establish a foundation for an option under the contract.

The plaintiffs were bound to take the white and mottled iron manufactured, unless it exceeded ten per cent of the gray mill, and unless, also, they, within a reasonable time, elected to reject such excess over ten per cent, and give the defendant notice of that fact.

In order to show, therefore, that they were not required to take white and mottled iron, it devolved on them to show the amount of gray mill produced by the furnace, and the amount of white and mottled iron, and that the latter exceeded ten per cent of the former, and that they elected not to take such excess, and duly notified defendant of such fact. The evidence introduced was entirely insufficient to establish the fact of an election on the part of plaintiffs, and notice to the defendant.

But even if the proof had established the fact that there was an excess of white and mottled iron over ten per cent of gray mill, under the evidence, the verdict could not be sustained.

On the 31st of December, 1872, the defendant had finished the manufacture of the iron. In the early part of January following, Moore, one of the plaintiffs, and James P. Card, an authorized agent of the plaintiffs, who also was interested with them in the purchase, went to the iron works, saw the iron, and had full and ample opportunity to make as thorough an examination of it as they desired. After they had looked the iron over, they requested the superintendent to have it weighed, with a view to a settlement.

On the 8th day of February, the defendant had the iron stacked in convenient piles for shipment, and weighed. On the 12th of the same month, an account of the iron was rendered, and it was paid for.

In the spring of 1873, plaintiffs' agent again visited the yard, and had an opportunity to examine the iron. In the month of March, 20 tons were sold to a party in Indianapolis.

In October, warehouse receipts were taken for 467 tons of the iron, and upon them money was borrowed. After thus accepting the iron, and assuming the exclusive control over it, and on the 31st of December, 1873, the plaintiffs discovered, as they claim, the iron was not of that quality called for by the contract. A notice in writing was served upon the defendant, in which it was notified that they declined and refused to accept 607 of the 610 tons. This, together with the warehouse receipts, were formally tendered back, and the money which had been paid for the iron was demanded.

We understand the rule to be, that, where an option is given, unless the time is determined by the contract, it must be exercised within a reasonable time, or the right will be lost.

In this case the plaintiffs saw this iron in the yard after it was manufactured, and had full opportunity to make as thorough an examination as they desired. It was weighed, they paid for it, and assumed the control of the property. Almost an entire year expires before any complaint is made in regard to the quality of the iron. In the meantime, iron has declined in the market almost one-half. Under such circumstances, to hold that the option given by the contract was exercised within a reasonable time, would be unjust, and contrary to the well settled rules of law which must govern a question of this character.

It is, however, claimed by the plaintiffs that the defendant knowingly and falsely pretended and warranted to the plaintiffs that the 610 tons manufactured was mill iron, and that, relying upon such representations and warranty, the iron was paid for; but the record contains no evidence of fraud, false representations or warranty.

It is not pretended that the defendant, or its agents, made any statement or representations in regard to the quality of the iron, except the statement or bill rendered of the iron, dated February 12th, 1873, in which the 610 tons is denominated mill iron.

The question, then, is, can this bill be regarded as a representation or warranty of the quality of the iron ?

The superintendent, McNair, testified that he made out the bill from the information, as to quantity and quality, derived from the weigher's certificate, as is usually done in making bills for iron.    The 610 tons were weighed at Card's request.    After plaintiff Moore and Card, in the early part of January, visited the yard and looked over the iron, and requested it should be weighed, Farnsley, who was the city weigher, did the weighing, and made out a certificate, and this bill, which is relied upon as a warranty, is a mere transcript from the weigher's certificate, with contract prices added.

While no particular form of words is required to make a warranty, nor is it necessary that the word warrant should be used to form such a contract, still it is necessary that such expressions should be used as show the intention of the party to bind himself to make good the quality of the articles as described or represented, and not a mere statement or expression of opinion as to the quality or character of the articles sold. *Adams* v. *Johnson*, 15 Ill. 346.

In *Towell et al.* v. *Gatewood*, 2 Scam. 22, where the vendor of a quantity of tobacco delivered the vendee a bill of the goods sold, signed by him, in which the tobacco was described as good first and second rate, it was held, the language used as to the quality of tobacco was a mere matter of judgment, and did not constitute a warranty.

We do not think the language used in the bill of iron rendered shows that it was the intention of the defendant to bind itself to make good the quality or grade of iron as described, but the designation, mill iron, was a mere statement or expression of opinion as to quality, and can not be regarded as a warranty.

As to the statement or representations being fraudulent, as averred in the declaration, that position is utterly untenable. The plaintiffs had as much knowledge in regard to the quality

of the iron as the superintendent of defendant, who made out the bill.  Before the bill was rendered, the plaintiffs saw and inspected the iron in the yard where it was manufactured, where they were at liberty to break it and make as minute an examination as they pleased.  No concealment was used or representations made to induce the plaintiffs to believe the iron was of any particular grade, or to prevent an examination into its quality.  Everything connected with the transaction seems to have been open and fair.  We are, therefore, of opinion that no right of action existed in favor of plaintiffs on the ground of warranty or fraudulent representations.

The 610 tons of iron, however, was paid for at $45 per ton.  For whatever portion of it was white and mottled iron, under the contract, plaintiffs were only required to pay $43 per ton.  The $2 per ton, therefore, overpaid, they will be entitled to recover back.

The instructions given in this case are voluminous.  Various objections have been urged to them, but we have not the time to consider them in detail.  So far as they are in conflict with the views here expressed, they are erroneous.

The judgment will be reversed, and the cause remanded for another trial consistent with this opinion.

*Judgment reversed.*