JOHN R. CALHOUN ET AL., Defendants in Error, v. DANIEL PAULE, Plaintiff in Error.

**St. Louis Court of Appeals, May 17, 1887.**

1. CONTRACTS—EXECUTORY—SALES WITH WARRANTY—VENDOR AND VENDEE.—So long as a contract of sale of a chattel, with warranty as to its condition, remains executory, the vendee is not bound to accept the chattel, unless it complies with the condition warranted.

2. ——— A contract of sale becomes executed between vendor and vendee, not upon the delivery of the chattel to the vendee, but upon its acceptance by him.

3. ——— The receipt of a chattel by a vendee is not necessarily equivalent to its acceptance by him.

APPEAL from the St. Louis Circuit Court, GEORGE W. LUBKE, Judge.

*Reversed and remanded.*

P. LEAHY and A. R. TAYLOR, for the plaintiff in error.

GEO. R. LOCKWOOD, GILBERT ELLIOTT, for the defendants in error : No acceptance of the engine in question was necessary to vest title in the defendant, Paule & Mummert having given a written order therefor. Rev. Stat., sect. 2514 ; Story on Sales ( 4 Ed.) sects. 257, 259, and notes. The delivery of the engine to the railroad company, consigned to Paule & Mummert, was

a delivery to their agent, and vested title thereto in them. *Graff v. Foster*, 67 Mo. 512 ; Story on Sales ( 4 Ed.) sect. 306 and notes ; *Schwabacher v. Kane*, 13 Mo. App. 129. The plaintiff's warranty being an express and special warranty, any implied warranty as to matters not specified, or that the engine was fit for its intended use, was excluded. *Pavement Co. v. Smith, Beggs & Rankin Machine Co.*, 17 Mo. App. 268. The defendant's instructions were properly refused, because they assume or declare that the burden of proving the warranty good rested on the plaintiffs. *Branson v. Turner*, 77 Mo. 495 ; *Johnson v. Agricultural Co.*, 20 Mo. App. 100 ; *Walls v. Gates*, 6 Mo. App. 242.

THOMPSON, J., delivered the opinion of the court.

This action was brought before a justice of the peace to recover the purchase price of a steam engine sold by the plaintiffs to the defendant. On a trial *de novo*, in the circuit court, the plaintiffs had a verdict and judgment for two hundred dollars, the sum being fifty dollars less than the agreed purchase price, from which judgment the defendant prosecutes this appeal. The plaintiffs were dealers in agricultural implements at Carrollton, Illinois, and the defendant was engaged in business, in partnership with Mr. Mummert, at East Carondelet, Illinois. He and Mr. Mummert desired the engine for use in a small feed mill, which they were then erecting at East Carondelet. Immediately after the transaction in controversy, the defendant and Mummert dissolved partnership, Mummert selling out his interest in the firm to the defendant. The engine was shipped by the plaintiffs to the defendant, in compliance with the following order :

"ST. LOUIS, Mo., November 9, 1885.

"*Messrs. John R. Calhoun & Co.* :

"GENTLEMEN :—Please prepare and ship at your earliest convenience, the following goods, viz :

"1 Ten-horse large engine, Garr, Scott & Co.'s

make, now at Carrollton, for two hundred and fifty dollars, said engine guaranteed to be in first-class running order, according to the letter of Oswald Jackson, Carrollton, Ill. Terms, cash.

"No agreements, conditions, or stipulations, verbal or otherwise, save those mentioned, will be recognized.

"Yours respectfully,<br>"PAULE & MUMMERT.

The letter of Oswald Jackson, referred to in the above letter, which, it would seem, had previously been shown by the plaintiffs to Paule and Mummert, was as follows:

"CARROLLTON, ILL., Nov. 4, 1885.

"*John R. Calhoun & Co. :*

"DEAR SIRS :—Mr. Geo. Darr has just now handed me your letter referring to his Garr-Scott engine on wood wheels. I put Mr. Darr's engine in thorough repair last fall, tested it to one hundred and fifty pounds, cold water pressure, which it stood—new piston ring—re-fixed slide valve and seat, etc.

"The engine, to the best of my knowledge and belief, at the present time, is in perfect repair. Mr. Darr assures me he has worked it but one day since I repaired it; it is a very powerful engine for its size, even more than one would suppose.

"Yours respectfully,<br>"OSWALD JACKSON."

"The above engine referred to is ten-horse power."

The engine was shipped by the plaintiffs, on November 11, in pursuance of the above letter, by rail, to East Carondelet, and a duplicate of a bill of lading was forwarded to the defendant by mail. When the engine arrived on the car at East Carondelet, the defendant, Paule, inspected it, and had it inspected by Mr. Williams, a millwright, and wrote to the plaintiffs to the effect that it was not the engine which he had contracted for, and declined to receive it. Some negotiations, then

and thereafter, took place between the plaintiffs and the defendant, in which Mr. Williams participated. The evidence is conflicting as to the result of these negotiations, but it appears that the plaintiffs agreed to throw off fifty dollars of the purchase price, if the defendant would take the engine, which he declined to do. The engine remained on a car on a side track, at East Carondelet, until January 6, when the defendant wrote to the plaintiffs as follows:

"Railroad company wants that engine out of the way at East Carondelet. What shall I do with it? Please send me word at the earliest time."

Thereafter the railroad company took the engine to its warehouse, at East St. Louis, Illinois, where it remained on storage until the day of the trial. No part of the agreed purchase price was ever paid or tendered by the defendant.

The contract, under which the engine was sold, must be construed to have embodied a special warranty, on the part of the plaintiffs, that it was "in first-class running order, according to the letter of Oswald Jackson." The statements in the letter of Oswald Jackson, thus imported into the contract, were to the effect that the engine was "in thorough repair," "in perfect repair," tested to a cold water test of one hundred and fifty pounds pressure, "a powerful engine for its size," and of "ten-horse power."

Testimony, drawn from the plaintiffs' witnesses, on cross-examination, tended to show that the engine was not in perfect repair; that some essential parts of it were missing, and that other parts were not in good condition, though it was in a condition to be operated. These witnesses of the plaintiffs, however, while admitting these facts, expressed opinions that the engine was in fair condition and good condition. Testimony adduced by the defendant was to the effect that it was in a very bad condition; that it was not a ten-horse power engine; that it was in such a condition that it would

have been dangerous to use it, and that it would not support a pressure of more than forty pounds to the square inch. According to the testimony of the plaintiffs' witnesses, on cross-examination, the cylinder head was patched, and so was the supply; the fire box was burnt, and patched with a flange and screw bolts, called a "soft patch;" the frame door was cracked; some of the stirrups were missing; there was no water gauge or steam gauge; the wheels and frame were partly worm eaten; the engine had no blow pipe and no belt; the governor was without a belt. Those engines were not built with blowers on them at the time when this was built, though it does not appear that blowers were subsequently added, or that a blower was not necessary to put such an engine "in perfect running order." One of the plaintiffs' witnesses, who had worked twenty years for the makers of these engines, having inspected it, testified, as others did, that it was in "fair running order." He and another witness, for the plaintiffs, testified that the patching of the crown sheet would not interfere with the running of the engine, though he admitted that "patching a boiler does not do it much good." There was one patch on the boiler and one on the cylinder head. This witness said: "Some bolts were wanting, and other things; but this would not constitute a defect in the engine. The wheels and frame were not broken or rotten, except that one spoke was gone, but that did not affect its first-class running order."

This testimony, as to the bad condition of the engine, drawn from the plaintiffs' own witnesses, was greatly strengthened by the testimony of the defendant's witnesses, who inspected the engine. They were all expert machinists. One of them took off the cylinder head and found that the cylinder could not be re-bored; the crown sheet of the fire box was broken, and very poorly patched, and showed leakage; the door frame was broken, and a couple of bolts were missing;

two water gauges were off, and there was no steam gauge; "the cylinder head was patched, and was so thin that it was only fit for the scrap box; it could not be bored any more; it was so far worn that it would not stand any more boring; the cylinder was entirely too light for a ten-horse power engine; it was less than three-eighths of an inch in thickness.   *   *   *   The patch on the boiler was not properly put on; the whole engine was in very bad condition; the wood work was rotten and worm eaten; the blower was gone; the gearing of the governor was almost entirely worn out; the pump was worn out and the crank was patched; the rod brasses were worn out; the lock of the cylinder head was broken; there was no governor belt on it; the truck brasses were rotten and worm eaten."

Another witness for the defendant, who had been boiler inspector of the city of St. Louis for eight years, having examined the engine, testified: "The boiler was all burnt out, and a country patch put on it; the cylinder was so weak that it could not be bored to stand a pressure, and at its opening the metal was only one-eighth of an inch thick; the condition of the boiler alone was sufficient to condemn the engine; the supply pump was a total wreck; it would have to be removed and a bran new one put in; the engine was in no running order; the grate bars were burnt; the fire frame was all wrecked and broken; the safety valve was cracked; there was no water gauge on it; the frame was pretty much rotten, and some spokes were missing from the wheels; there was no steam gauge; the main frame of the engine was cracked, and a band put around it. I would not allow fire to be started in her, for fear of an explosion."

Another expert machinist, testifying for the defendant, said: "I examined the boiler, and found, on opening the fire door, that the grate bars in the center of the furnace were burnt out. I next examined the fire box and found a soft patch secured by "taffly." I

opened the smoke box door and found the boiler head badly bulged out. I am satisfied that it would not be safe to put fire in it. I believe the engine could not be run safely. As a licensed engineer, I would not put fire under her, believing that she could not be run with safety. I believe she would carry forty pounds; but if I had to make a living engineering, I would quit and go to shoveling, rather than work at that engine. She might carry forty pounds, but not fifty pounds. * * * The city pressure is forty-two pounds, and this engine might hold that if she was in running order. Originally, that boiler had been overheated. I never saw a portable engine so badly bulged as that." It should be added that the testimony of this witness was somewhat impaired by the extravagance of his concluding statement, "that this engine looked as though it had been made in the year one. It was a six-horse power." The testimony on both sides showed that it was one of Garr, Scott & Company's ten-horse power engines.

Mr. Williams, the millwright already spoken of, who examined it for the defendant on a flat car at East Carondelet, said: "I found it in a generally bad condition; the frame around the fire box was cracked. The grate bars were burnt; there was a patch on the crown sheet, put on by a stud bolt, and not in a workmanlike manner; the supply pump was in a bad condition; it was broken. I noticed a bulge on the after end of the boiler, and there was a water and a steam gauge missing; the running gear (wheels and frame) were rotten and weather beaten." This witness also testified, that he advised Mr. Paule that the engine was not in a fit condition to run; that he then saw Mr. Calhoun, one of the plaintiffs, and told him its condition; that Mr. Calhoun said if that was so he would take it back. No attempt was made to rebut this evidence, offered by the defendant, as to the bad condition of the engine.

There was no evidence in the case, tending to show

the difference between the value of the engine, according to the warranty and the agreed price of two hundred and fifty dollars, and the value in its actual condition; and, consequently, there was no evidence which warranted the court in giving the plaintiffs a judgment for the agreed purchase price, less the sum of fifty dollars. Certainly, the subsequent agreement of Mr. Calhoun to throw off fifty dollars, if the defendant would take the engine, did not warrant this; because this agreement was shown, by the evidence, to have been a proposition tendered by way of compromise, and, as it was not accepted, it did not bind the plaintiffs for the purposes of this action. But, as they do not complain of this, the matter is material only as tending to show that the case was not decided upon a proper conception of the evidence. If, on the above evidence, the defendant, in the state of the law, was entitled to have any deduction from the purchase price, he was entitled to a deduction of the whole sum.

In determining the effect to be given to this evidence, it is necessary to consider on whom the burden of proof in such an action lies. Counsel for the plaintiffs argue, on the authority of *Branson v. Turner* (77 Mo. 489, 495), that the burden of proof lay on the defendant. It is, indeed, said in that case, that an instruction was faulty in declaring, in effect, that the burden rested on the plaintiff to prove that the warranty was good, and Mr. Commissioner Philips adds: "When he showed the sale and delivery to the defendant, if the defendant claimed a failure of consideration, total or partial, consequent upon a breach of the warranty, he held the laboring oar as to this issue." In that case, the property, which had been sold and delivered, had been kept by the vendee for two weeks before he undertook to return it. The opinion fails to draw the well known distinction between a mere delivery and an acceptance; and it must be presumed that the word, "delivery," was used in the language of the learned judge in the sense of acceptance.

There is no doubt whatever that, where a contract of sale has been so far executed that the property has been delivered by the vendor and unconditionally accepted by the vendee, in a subsequent action by the vendee for the purchase money, if the vendee pleads, as he may, a breach of an express warranty as a partial or total failure of consideration ( *Voss v. McGuire*, 18 Mo. App. 477), the burden is on him to show that the warranty was broken. The reason is, that, in such a case, he sets up the breach of warranty or the failure of consideration, total or partial, as an extrinsic defence. But where, as in this case, the goods, though delivered to a carrier to be transported for delivery to the vendee at the place agreed upon, have never, in fact, been accepted by the vendee, and the vendor sues for the purchase price, he must show a compliance, on his part, with the terms and conditions upon which the vendee agreed to purchase the goods; and if the condition was a warranty of quality, he must show that the goods were of the quality warranted. *Brewer v. Railroad*, 104 Mass. 593; s. c., 107 Mass. 277; *Nichols v. Morse*, 100 Mass. 523. This is nothing more than an application of the ordinary rule, in actions upon contracts, that the plaintiff must prove a compliance with the terms of the contract on his part, which is a condition precedent to his right to recover of the other contracting party for a breach of the contract.

Such being the law, I confess myself unable to see that the plaintiff adduced any evidence which, taken most strongly for him, would have authorized a jury to find that he had complied with the terms of the guaranty, upon which the defendant had agreed to accept the engine. It was to be "in first-class running order, according to the letter of Oswald Jackson;" and Mr. Jackson, being an expert machinist, and having examined the machine, tested it, and repaired it, certified that, to the best of his knowledge and belief, at the present time, it was "in perfect repair." The expres-

sion, "in first-class running order," and the expression, "in perfect repair," are substantially synonymous, when applied to a machine which is not in perfect repair, unless it is in first-class running order, and which can not be in running order, unless it is in repair. It is, therefore, a fair interpretation of this contract, that the plaintiff agreed to take the machine, and pay two hundred and fifty dollars for it, in cash, provided it should be in first-class running order. Now, as I read the testimony in regard to the condition of the machine, all of it concurs in showing that it was not in a condition which, by any fair intendment as to the meaning of words, could be designated as first-class running order. Several essential parts of it, which are known to be common to machines of this character, were, according to the testimony of all the witnesses, wanting. Other parts of it, according to a concurrence of all the testimony, were out of repair. The fire box was burned, and patched; the door frame was cracked; one of the wheels had a spoke missing; the wood work on the machine was worm-eaten; the boiler was patched, and so, also, was the cylinder. If, instead of the words, "in perfect repair," or, "in first-class running order," the words of the warranty had been, "in fair running order," or, "in good repair," I possibly might be able to see that the testimony of some of the plaintiffs' witnesses would bring the machine up to that standard. For, although they all concur, with possibly one exception, as to the designation of the parts which were missing, yet, when they leave the domain of fact, and come to that of mere opinion, they express opinions of the character following: One of them expressed the opinion that it was " in a fair condition, in running order." Another said that "it was in fair condition, and in good running order." Another one ventured to say that "its condition was in working order." Another one of them, an expert, expressed no opinion as to its condition. The words, "first-class" and "perfect," when applied to goods, ma-

chines, or anything of the sort, imply a high grade of quality or condition. A warranty containing these words is clearly not satisfied by the delivery of a machine in fair, in good, or in working condition. I am, therefore, clearly of opinion that there was no substantial evidence to show a compliance by the plaintiffs with the contract on their part, and, consequently, that we ought not to remand the cause, and put the defendant to the expense of another trial. We have, in similar cases, adopted the practice of reversing the judgment simply, without remanding the cause, which, according to our understanding, has the legal effect of a judgment of non-suit. I am of opinion that we ought to take this course in the present instance, but, my brother Rombauer being of a different opinion, the cause will have to be remanded, and, therefore, it becomes necessary to consider the rulings of the trial court upon the instructions.

The defendant requested, and the court refused, the following instructions:

"1. The court instructs that, if the plaintiff failed to deliver to the defendant, or his agent, a Garr, Scott & Company engine, of ten-horse power, and in first-class running order, then the defendant was not bound to accept the engine tendered, and, if the defendant did refuse to accept the engine so tendered, not being of such description, and notified the plaintiff of his non-acceptance of the engine, tendered within a reasonable time after such tender, then the plaintiff can not recover."

"2. The court declares the law to be, that, under the contract read in evidence, the defendant was not bound to accept the engine called for by said contract, unless the plaintiff delivered the same to the defendant or his agent in first-class running order. And unless the plaintiff did deliver such engine, in such condition, to the defendant or his agent, the defendant was not bound to accept the same, and, if the defendant notified the plaintiff of his non-acceptance of the engine, within a reasonable time after he discovered that said engine was

not in the condition of first-class running order, then the plaintiff can not recover."

"3. The court declares the law to be, that the burden of proof, in this case, is on the plaintiff, to show, by a preponderance of evidence, that he delivered the engine, mentioned in the contract read in evidence, to the defendant, or his agent, in first-class running order; and, if the plaintiff failed to deliver said engine, in such condition, and the defendant refused to accept said engine, and gave the plaintiff notice of such refusal, within a reasonable time thereafter—that is, after the plaintiff tendered said engine, then the plaintiff is not entitled to recover."

These instructions, except the third, embody, substantially, the same conception of the law of the case, and that adds to this conception the element that the burden of proof in such a case is upon the plaintiff, which, as we have already shown, is the law. The refusal of these instructions, in a case tried by the court sitting as a jury, and the failure to give any instructions embodying the same propositions of law, indicate, especially in the state of the evidence in this case, that the case was not tried upon the proper applicatory principles of law. The learned judge seems to have overlooked, as courts have frequently done, the essential distinction between the *delivery* of personal property, upon a sale, and the *acceptance* of it by the vendee. A *delivery*, such as will satisfy the statute of frauds, and transfer the title from the vendor to the vendee, is one thing, and the acceptance of it, such as will estop the vendee from returning it to the vendor, is quite a different thing. *Simpson v. Krumdick*, 28 Minn. 352, 355. There may be an acceptance without delivery, as where the purchaser has inspected the goods in the custody of the seller, and has agreed to buy the particular goods. There may, also, be a delivery without an acceptance as where the purchaser has never seen the goods, but has ordered goods of a particular description, quantity,

or quality, to be manufactured for him, to be shipped to him, or, otherwise, to be delivered to him. In such a case, delivery to a common carrier, to be shipped to the place of designation, and there delivered to the purchaser, is not tantamount to an acceptance of the goods by the purchaser, unless there is an explicit agreement to this effect (*Hanson v. Armitage*, 5 Barn. & Ald. 557; *Acebal v. Levy*, 10 Bing. 376), although it will have the effect of passing the title from the seller to the purchaser. *Graff v. Foster*, 67 Mo. 512. The reason is two-fold : (1) The carrier is not the agent of the purchaser, to accept the goods for him, and (2) in every such case, the purchaser has the right to a reasonable opportunity, and a reasonable time in which to inspect the goods, for the purpose of ascertaining whether they are of the description, quality, or quantity, for which he has stipulated ; and if, upon such inspection, he finds that the terms of the contract have not been complied with, he has a right, within a reasonable time, to reject the goods. 2 Benj. on Sales [Corbin's Ed.] sects. 966, 1042; *Isherwood v. Whitmore*, 11 Mees. & W. 347 : *Croninger v. Crocker*, 62 N. Y. 151, 158; *Boothby v. Scales*, 27 Wis. 626; *Bromler v. Boulton*, 44 Mich. 218; *Paige v. McMillan*, 41 Wis. 337; *Carondelet Iron Works v. Moore*, 78 Ill. 65 ; *Knoblauch v. Kronschnavle*, 18 Minn. 300, 305; *Boughton v. Standish*, 48 Vt. 394; *Simpson v. Krumdick*, 28 Minn. 352 ; *Doan v. Dunham*, 79 Ill. 131 ; s. c., 65 Ill. 512 ; *Bianchi v. Nash*, 1 Mees. & W. 545 ; *Beverly v. Lincoln Gas Light Co.*, 6 Ad. & El. 829; *Couston v. Chapman*, L. R. 2 Sc. App. 250. The defendant was entitled to have the law, as thus laid down in the adjudged cases, declared by the court, so far as it was applicable to the facts of this case, and the foregoing instructions were aptly drawn to this end. The refusing of them was error.

The defendant, therefore, had the right, in the state of the law, either to accept the engine, pay for it, according to the contract, and then sue the plaintiffs for the

damages which he had sustained by their breach of warranty (*Martin v. Maxwell*, 18 Mo. App. 176, 180), or to rescind the contract, and return the engine, within a reasonable time. *Johnson v. Whitman Agricultural Co.*, 20 Mo. App. 102; *Branson v. Turner*, 77 Mo. 489. The intimation of this court, in *Walls v. Gates*, on its first appeal (4 Mo. App. 1), and the decision of this court in the same case, on its second appeal (6 Mo. App. 242), that, in the case of a purchase with express warranty, where there is no question of fraud, the vendee can not insist upon returning the thing purchased, unless it was agreed between the parties that the contract might be rescinded, if there was a breach of the warranty, can not, since the decision of the supreme court in *Branson v. Turner* (77 Mo. 489), be regarded as the law, and is hereby overruled. It must, then, be taken upon the testimony in this record, that the defendant had the right to rescind the contract and return the engine. That he elected to rescind the contract is undisputed. The evidence does not distinctly show, however, that he offered to return it; but this can not conclude his rights, because all the evidence in the case shows that it would not have been returned. On his objecting to receive the machine, because of its defective condition, they, after a correspondence and a conference with him, insisted upon holding him to his contract. The return of the machine would, therefore, have been nugatory. The law did not require him to go to that useless expense. The law does not require a man to do a vain thing. It does not make it obligatory upon a person, in order to save his legal right, to make a tender, either of money or any other thing, where it clearly appears that the tender would be rejected if made. *Stumpf v. Mueller*, 17 Mo. App. 290; *Westlake v. St. Louis*, 77 Mo. 47. The plaintiff, therefore, did all that he was required to do when, in his letter of January 6, he requested the instructions of the plaintiffs as to what disposition he should make of the engine. They gave him no instructions, and, therefore,

he left it in the hands of the carrier to whom he had intrusted it, and from whom he had never accepted it, in whose hands it remained at the date of the trial.

The judgment must accordingly be reversed and the cause remanded. With the concurrence of Rombauer, J., it is so ordered. Lewis, P. J., is absent.

Rombauer, J., delivered a separate opinion.

I am not prepared to say that the plaintiffs in this case failed to offer substantial evidence, entitling them to go to the jury. Whether such evidence was sufficient to bring the engine tendered within the description of the engine sold, is a question of fact, and not of law, and being a question of fact, it is not the proper province of this court to solve it by analyzing the plaintiffs' testimony, and comparing it with that of the defendant. In the other views taken in the foregoing opinion, relative to the burden of proof, and the correctness of the defendant's instructions, I fully concur.

Thompson, J., delivered the opinion of the court on the motion for re-hearing.

As long as the contract remains executory, the vendee has the right to reject the goods, if, when he has an opportunity of inspecting them, he finds that they do not answer the representations on which he has agreed to purchase them. It is immaterial what those representations are called, whether conditions or warranties. If the goods are not what they are represented to him, whether in quantity or in quality, he has the right to reject them; and when he thus rejects them, he is not bound to return them at his own expense. In this respect there is no difference in principle between this case and the case of *Landesman v. Gumersell* (16 Mo. App. 459), where this court held that, where the vendor sends more goods than the vendee has ordered, the latter is under no obligation to inspect them, or to return them at his own expense. It is only where he accepts

the goods, and afterwards seeks to rescind the contract, that he is bound to return them.

There is nothing further in the motion for re-hearing, which seems to call for special observations, and, with the concurrence of Rombauer, J., it is overruled.